Case No. 23-1252 and Case No. 23-1256, both from the District of South Dakota, United States v. James Garrett and Levi Garrett. Mr. Beardsley. Go ahead. Counsel. My name is Mike Beardsley. I represent James Garrett and Levi Garrett, the appellants in this case. Your Honors, a defendant is entitled to a new trial if the evidence weighs heavily enough against the verdict that a miscarriage of justice may have occurred. The affidavit that was submitted post-verdict in this case by Cody Hostler proves that a miscarriage of justice did occur. This case is about plant dates. In 2018, my clients, the Garretts, certified that they planted roughly 2,200 acres of sunflower between the dates of June 10th and June 16th. The plant date deadline in 2018 for sunflower in South Dakota was June 20th. The government presented evidence by way of a handwritten log kept at Sioux Nation LLC in Pure South Dakota. Cody Hostler testified regarding that log. During his testimony, Mr. Hostler testified to the jury that the log indicated my clients could not have obtained possession of the seed until at least June 20 or June 22. Mr. Hostler's affidavit directly contradicts his trial testimony. Well, Counsel, you can't say it directly contradicts when he says his testimony, quote, remains consistent, quote, and is true and correct in his own words in the same affidavit. That's not, would you say direct contradiction or some such words? I thought that was a gross overstatement. But you may address the point. And of course, when somebody comes forward to the defense and says, I need you to file an affidavit with the district court to clarify my testimony, his affidavit was not altered in any way. And he's going to indicate, as any witness would, that his trial testimony was consistent and accurate. However, paragraph nine of his affidavit, and the substance of his affidavit when read in a whole, refutes his trial testimony. In paragraph nine states, in this matter, defendants took eight pioneer pallets for sunflower seed. Looking at the invoice attached here to and marked as Exhibit A, there is not a charge for the pioneer pallets, meaning the defendants removed the sunflower seeds from the pallets and returned said pallets to Sioux Nation in good condition prior, prior to payment of the seed. Now, the evidence... He testified at trial many times that you could pick up the seed before the invoice, right? Correct. Many times. And that it was... So how's it even inconsistent with that? Well, and here's the inconsistency, Your Honor. But routinely, the court and the government relied on examples of Mr. Hostler's testimony. The court specifically states, in its order denying defendants' motion, in 2018, James bought eight pallets of sunflower seed no earlier than June 20th and received delivery no later than June 22nd. The court goes on to state, Sioux Nation LLC kept a log of seed sales, reflecting that James bought eight pallets of sunflower seed on June 20th with, quote, Dell made on 6-22-18 and with an invoice dated June 21, 2018. But more importantly, and the government has argued this, the court has relied on it and we believe the jury relied on this. A Sioux Nation LLC representative, which is Cody Hostler, testified about the log, which was made contemporaneous with the purchases and shows that the earliest possible date when the Garrett's could have taken the seed was June 20 with the probable date of June 22, 2018. That simply is no longer accurate. Now, Mr. Hostler was cross-examined at trial. He testified he didn't author the log. He testified he couldn't verify its accuracy. And if you review the log, it's indecipherable. There are names. There are redactions. There are numbers. There are names like my client's name, James Garrett, without a date next to it. Okay? But the issue before this court is whether or not a jury should hear the accurate interpretation of this log. And we believe that they should, Your Honor, because the affidavit is the only evidence, the only reliable evidence that the United States government had and that the jury relied on in convicting my clients on counts four and five. Now, you're going to hear from the government about witness testimony of my client's neighbors that came in and they said that there were weedy conditions. They didn't think that they ever planted. But you have to remember the government also charged my clients in 2016, in 2017, and in 2020 for the exact same allegations. But the difference is, in those years, they didn't have any documentary evidence or a third-party seed distributor to place possession of the seed past when they certified that they planted. They had neighbor testimony. And you know what the jury did? The jury acquitted my clients on every single other count. So I don't believe that the witness testimony surrounding the charges in 2018 was reliable. And in addition to that, every one of them testified that they couldn't tell when my clients put seed in the ground. Now, farming practices can be very difficult, and I had to learn how to do it. And I had to learn many nuances of how farmers do it these days. And what my clients did was called a no-till plant method, meaning that you can insert seed into the ground before you burn down the vegetation with chemical. In fact, you can put seed in the ground, and the testimony was from everybody, including the producers and the experts in this trial, you can wait days, sometimes weeks, before you burn down the vegetation with chemical. The bottom line is that the neighbors couldn't possibly tell when my clients planted, what they planted, or where they planted. And no evidence was ever proffered by the government during trial to do so. Now, it's important to remember, there's no allegation that in 2018 my clients didn't plant sunflower. They purchased 185 bags of sunflower, which was appropriate to plant roughly 2,200 acres of land. Their only allegation is that they didn't put the seed in the ground between June 10 and June 16. And the only reliable evidence that they had before this jury was they couldn't have put the seed in the ground between those dates, because we have a record, even though it's a handwritten log on a yellow sheet of paper, and testimony that says they didn't have the seed. What about the herbicide? Thank you, Your Honor. They also rely on a spray record from July 7. Now, it's important to remember that on June 27 and June 29 of 2018, two massive hailstorms went through the Sully County area, right over my client's property. Okay? There has been testimony that the hail was so devastating it destroyed buildings, it destroyed cars, and in fact, one witness said it would even drive a crop right back into the ground. There was testimony that acres and acres of pasture land was wiped out and looked like a golf course. After this storm, on July 2, my clients filed a notice of loss with their insurance company. An adjuster was assigned, communications begin, and my clients receive permission to burn down their fields and get to work at planting forage sorghum and feed crop for their cattle. Now, in addition, producers and farmers are able to receive permission to burn down their crop and leave strips in case an adjuster hasn't made it out to adjust the field. That adjuster was Kenny Buchholz. Now, there's documents indicating that there was official written permission to burn down the field sometime in mid-July, but my client, Levi Garrett, testified that they received permission, they left strips, and the field was adjusted. Kenny Buchholz testified that he actually put boots on the ground and saw that the field had been planted. So I don't believe that the spray records from July 7 or July 6, when my client received permission from the insurance company to spray the fields, has any relevance on when he put the seeds into the ground. Additionally, most of these insurance policies, when you incur a total loss, they require you to devastate the crop. They require you to do so so that you don't double dip, get paid for a total loss, and then get a minimal yield and go sell it again. So I don't believe that the two factors the government and the court has relied on in denying our motion prove anything. The only thing they had was Cody Hostler and a handwritten log. That's it. Now, regarding 2019, this dealt with a prevent plant claim, and I had to learn what a prevent plant claim was, and that is when the conditions are such that it is difficult for a producer to get his crop in the ground and have a successful yield, they can declare to their insurance company that we're going to prevent plant, meaning we're not going to plant. You get paid a percentage, but we're not going to plant any of our ground. Now, in 2019, there were record numbers of prevent plant claims in South Dakota and nationwide due to the climate condition. My clients go to their adjuster, Melissa Schultz. They say, advise Federal Crop, we're prevent planting. She said, no problem, and said, you know what, if you plant two separate 20-acre tracks of corn on your property, you will realize a 65% reduction in your premium, which I think equates somewhere between $65,000 and $70,000. There's no requirement on location. There's not even a requirement on deadline. And in South Dakota, corn is normally planted in early May, and there's that saying, knee-high by the 4th of July, right? Well, in this case, the documents indicate my clients planted the corn on June 17th. The government concedes that my clients purchased 11 bags of corn from Sioux Nation on June 15th. Cody Hoster testified 11 bags of corn would be sufficient to plant 40 acres of ground. Now, the dates here are very important. Corn's in the ground on June 17, 2019. Barry Jennings, an adjuster for crop services, comes out to the farm. We're talking about 800 acres. Did a Mr. Opp come with him? Not on the first visit. Okay, proceed. On the first visit, Mr. Jennings comes out, unbeknownst to my clients, and they're willing to do that, and can't find the corn. Early July was his visit. The seed had been in the ground for a couple of weeks. Maybe an inch, maybe two inches. But also, you've got to remember, my clients use the no-till method. So these seeds are planted in fields that have weeds in them. A, we're talking about Sully Butte County. The topography in this area is very dramatic. Counsel, you're into your rebuttal, as you know. Thank you, Your Honor. Yeah. We attempted to show photographs of a neighboring farm because the jury had relied on this argument that my clients spread corn stover in these two locations. The district court denied our request to show a neighboring farm to exhibit the fact that these fields were very similar. And we believe it was error, Your Honor. What was the reason for that ruling? The reason was, I believe, that he didn't think my client had the foundation to testify to the photographs because he didn't have a relationship with the farmer. However, my client did know when the corn was harvested, dist, and the time of year that the photographs were taken, corresponded to the time of the year the photographs were in evidence. This is Levi Garrett. Correct. Did he take the photographs? Yes, he did. And did he testify that he took the photographs? Yes, he did, Your Honor. And gave the dates that he took the photographs? The dates were on the photographs. And testified as to the location? Yes. So what was the significance of not having a relationship with the owners of the property? That's a good question. The court did not allow us to go into that fact, but Levi Garrett indicated to the court that he knew the circumstances surrounding how the field was taken care of, dist, and when it was, and took the photographs to show that they couldn't possibly have spread stover around these two tracks of land. Now, if you have any other questions, Your Honor, I will thank you. And so you can plan. We'll give you one minute for rebuttal. I appreciate that. Thank you. Thank you. Mr. Coloner. Good morning, Your Honors. Counsel, may it please the Court. I'm Kevin Coloner with the U.S. Attorney's Office, representing the government in this matter, and we are asking that these three convictions be affirmed. I'll sort of go in the order that defense counsel went, and I'll address this Hossler affidavit first. Judge Benton, you mentioned that, you know, the affidavit sort of starts with this disclaimer, that he's not disclaiming his trial testimony. And, in fact, when he testified, there were many questions asked about how well he knew, essentially, when the seeds were picked up, when they were put in the hands of the Garrets. And he testified at multiple places that this record wasn't definitive in terms of the date. I think ultimately on, I think, re-re-redirect, he said he thinks it's within a day or two based upon that record. Subject of cross-examination in front of the jury, subject of apportion of defense counsel's closing argument, subject of cross-examination of the case agent, all pointing out to the jury that that particular exhibit didn't definitively say when the Garrets had the sunflower seed in their hands. Not really in dispute in terms of the trial evidence that that exhibit itself didn't definitively say when the seed was in their hands. Why does that not matter? This case isn't about when they got the seeds. The case is about whether or not they planted sunflowers in 2018. And we had, I think, six, one, two, three, four, five, six neighboring witnesses, all who showed on a map, Exhibit 96, where they lived in correlation to these fields in question. We had an Exhibit 101, which showed exactly the fields in question, which defendant certified which. They all testified in unison that there weren't sunflower seeds planted at the point of these hailstorms in 2018. The hailstorms were a cataclysmic event in that area, and everyone remembered that definitively. There was some mention about, well, there was nothing different about these other years, yet the jury acquitted on these other years. Big difference in that year was the hailstorm. That's the subject of their testimony. They all knew. They talked about how the Gerritz fields, sure, they were never routinely planted when everyone else was planting. But that year in particular, they testified that they knew for certain that those fields had not been planted. But did the neighbors testify about the other years? They testified generally about how, you know, we neighbored the Gerritz for years, and they never plant on time. But did they — were they questioned about the other counts of the indictment is what I'm asking. And did they support the government's theory by their testimony? They did, but it wasn't as — But is it true that this, the counts of conviction, were the only counts for which there was documentary evidence from the feed store? I believe that's not correct, Your Honor. I believe there was evidence of seed purchases from some of those other years. I'll confess. I mean, I came here focused on these counts of convictions, and there's a large record here. And so my focus in reading through the record was on those years. Well, what troubles me about the case is no one seems to know what those records mean. Well, what was before it — There's real confusion if you read this record and the affidavit and the vague notations that are made. As I read it, read the record, this is from a sheet that's posted by the door and with handwritten markings. And I just think that's pretty troublesome that there's that kind of lack of clarity as to something that this significant. Well, I — two things. One, that lack of clarity was put in front of the jury through a number of different witnesses and through the cross-examination and talked about in closing, et cetera. Number two, that that was not as significant of evidence in 2018 as it's made out to be here on appeal, because we have direct testimony from all the neighbors about whether this planning had occurred. There's mention that there was a no-till practice. Some of those neighbors talked about how you prepare a field for no-till practices, and they even testified that hadn't happened in 2018 either. You also had this spray complaint that comes in coincidentally in July, early July of that same year. Now, why is that significant? Well, the big significance there, at least in my view, is that there were photographs taken, photographs showing fields full of weeds, or at least the area that the spray complaint regarded, which was part of these areas that sunflowers were supposedly planted on. You also had testimony from an agronomist who said, you know, look. So there were photographs with respect to the sunflower counts? Yes. Yeah. Photographs taken, shown to the jury. I thought I may have written down. Yeah. 63 through 67 are the exhibits that show, you know, dead and dying weeds, but no sunflowers there. Who took those photographs? A guy named Nathan Farley. Did he testify? He did testify. Was he permitted to explain what the photographs depicted? Yes. And we also had an agronomist testify that if you had planted by that certified plant date, you would have emergent sunflowers, and if you had sprayed on that date, you would have killed all those sunflowers. Why is that important? Well, you can't make an insurance claim, and before they come and adjust it, you burn down your whole crop. That was part of Kenny Bucholtz's testimony, and that's what the record showed here that what Levi Garrett did is he made this claim after the hailstorm, makes this claim, and then he sprays down all of the, he kills off the plants before the adjusters come out. And that is completely inconsistent with making a valid insurance claim, number one, or number two, trying to keep your sunflowers alive that are supposedly growing in the field. Was there any testimony on how long it takes to plant the number of acres of sunflowers that they said that they planted? Yeah. There was testimony about that, and I'm trying to remember which witnesses in particular. There was testimony about how they used a 24-row planter, and it's a pretty fast-moving process when you plant with that big of a rig. Do you remember the amount of time it would have taken? I can't recall, but, Your Honor, I believe that is in the record, some sort of estimates of what it would have taken. But the certified date, of course, was back in June, I think June 20th. So before these photos are taken that show no sunflowers growing. So we have this testimony from all of the neighbors. We have this kind of coincidental spray investigation that happens along with photographs. So the affidavit certainly doesn't fit the quality of something that would result in a new trial here. We've laid out the legal standard. Of course, the Court's well aware of it. But it doesn't really contradict anything, and it's certainly not likely to produce an acquittal, given all of the other evidence of that 2018 year. 2019, talking about the corn and the count against James Garrett. We have these two insurance investigators who go out, and one of them goes out once solo, and then — Is this sunflower or corn? This is corn. In the 2019 count, this is count six regarding defendant James Garrett. So we have these two gentlemen who go out. One of them goes out first. He doesn't see corn planted. He walks the fields. He doesn't see corn planted where it's certified to be planted. He takes photographs. That's part of Exhibits, I think, 74 and I want to say 75, that are kind of packets of these investigations of the two separate fields where this enterprise unit corn, 20 acres essentially, in each of these fields should have been planted. He sees no corn in either of these places, documents it with photographs, then goes out with his supervisor, Mark Opp. And he's out there in late September, I believe, of 2019. They do the same thing. By the way, these photographs have latitude and longitude designations on them to show exactly where they're taken from. There's testimony about the vantage points, about where they were at. Again, photographs of fields full of weed where there's no corn. Then they go out October 11th. They notify the Garretts that they're coming out. They want to be shown the corn and the machinery. October 22nd is when they actually go out. There's mention in the briefing that they were given 35 minutes warning. They were given 11 days warning. That's in the record at several places. Eleven days later, they come out. Sure enough, Levi Garrett first takes them to a field that's not even one of the fields that has been certified, and there's this disced up field with this corn stover. Then takes them to one in the same field that photographs had been taken on that these two men had been at weeks before, and suddenly it's also disced up and there's this corn stover spread around the ground. You'll see in their testimony at times it almost reads as though they're incredulous when they're being asked questions because they're saying, I know the corn wasn't planted there. Well, why is that? It would have been some corn to have been planted, have grown to full maturity, have dried out and been harvested in about three weeks. They were there, there was no corn, and suddenly they're being shown this ground and saying, well, there's corn there. So the latitude and longitudes match up if you want to get in the real granularity of those photos between the September visit and the October visit, at least on the field that they were shown that was one of the certified fields. There's also an inference the jury could draw, well, why is he bringing them to a field that wasn't even where the corn was supposed to be planted? Well, because they know they didn't plant the corn. By the way, this corn stover, there was testimony from Mark Opp, I believe in particular, that it didn't look like what you'd see if it was actually disced up harvested corn. There's no root balls, he didn't see many kernels, he didn't see corn cobs, things of that nature. So it also visually did not appear to him to be corn stover. Much is made about the fact that there was no proof by the government that a manure spreader was used. Counsel, you're talking about the appearance. I'm gathering that that was the purpose of the defense offering the photographs that Levi Garrett testified that he took of nearby fields. Yeah. Thank you, Judge Shepard. I wanted to address that and your questions about that. Yeah. I just wonder why the government was, you know, the government offers photographs. Yeah. Attested to by the photographer who gave the information about time and place and all of that. And Mr. Garrett here offers photographs and gives testimony as to time and place and circumstances, but they're not permitted to be presented to the jury. What's your thought about that? Well, there's a discussion, a sidebar about it in the record, and the district court explains the reasoning. Number one, it's a very hazy photo taken from a cart outside through a car window. It's 2021 now, so a much different year. I grant that may not be the biggest factor. But he didn't know the farmer. He didn't know when it was planted. He didn't know when it was dissed. He didn't know how many times it was dissed. He didn't know what kind of machinery dissed that particular field.  But doesn't all that go to weight and would be subject to argument to the jury? It could, Your Honor, and it had somehow come in. Maybe it's not a lot of evidence, but. . . Well, it's certainly not the type of evidence that could have led to an acquittal in this case in the sense that there was. . . I mean, you just don't know, do we? Well, he testified directly that he planted the corn and that, you know, I mean. . . The point is the district court didn't abuse its discretion in denying this exhibit based upon the real lack of foundation here. You know, there was mention that Levi testified about all these things in foundation. What he said was, I do know that when asked about, I think, when it was. . . when it had been harvested. He didn't testify anything. There was no offer of proof on, for instance, what kind of machinery they used, when it had been dissed, how many times over. Those questions. . . Well, I thought. . . I mean, maybe I'm wrong, but I thought the purpose was to give the jury photographs here to judge the appearance. Yeah. Not necessarily all the history of what happened or how it was. . . how it was created, this corn store. . . Store. Store. Store, yeah. To rebut the assertion by the government that, you know, there's something, like, fraudulent about this. And so here's photographs of a nearby field that has a corn store of a similar appearance. Yeah. Your Honor, I notice I'm out of time, but if. . . Yeah. Yeah. The linchpin of the evidence here was you've got guys who've gone out there, photographed these fields, there's no corn, they're full of weeds, and three weeks later, suddenly they're being told, yeah, corn was planted here all along and now it's been harvested. It's dried out and been harvested at this point. And so this testimony about what they had spread over the field, yeah, it certainly seemed to show that they were engaged in some subterfuge, but that wasn't the only evidence about that. They brought him to the wrong field and they clearly were claiming that corn was planted somewhere where these two men knew it hadn't been because they'd been standing there three and a half weeks before, so. . . Okay. Thank you, Your Honor. Thank you for your argument. Mr. Beardsley, rebuttal. Thank you, Your Honor. First of all, the two men went to the wrong fields. The FSA maps had indication on them that the location of the corn was different than where the corn was planted. The first gentleman came out in September when the corn would have been at two inches at most. Then Mr. Opp and Mr. Jennings came out and couldn't find it. Did they ever call the farmer? No. In October, they called Levi and said, I'd like to come take a look at your corn. It was October 11. He said, sure, come on up. Now, Levi testifies he had 35 minutes' notice, even if he had 11 days' notice. The theory of the government was that these farmers obtained corn they didn't have because the allegation is they never planted it, a manure spreader that they didn't own, and they spread corn to create a ruse in two separate fields. The fact of the matter is the photograph of the McCarty farms look nearly identical to the photographs of the Garrett's fields, and that should have been presented to the jury. Thank you, Mr. Batesley, for your argument. Cases number 23-1252 and 23-1256 are submitted for decision by the Court. Ms. McKee, does that conclude the docket? Yes, it does, Your Honor. Okay, and we'll stand in recess until 8.30 a.m. tomorrow morning. Thank you.